JAMES W. HART, Appellant, *v.* WILLIAM TAYLOR, et al., Respondents.

H. contracted to make a safe for the C. N. bank for $7.000; after the work was begun, to secure a loan for $2.500, he gave to Le B. a power of attorney to collect the price of the safe, also an assignment of the contract and defendants' guaranty that the safe should be completed and delivered by the first of the next November, or that in case of default they would pay the loan. In December following the safe was sent to the defendants who were to do certain work thereon, which they did to the amount of $1,500. On December 31, H. and the plaintiff entered into a contract by which the former agreed to pay the latter for services $1,125, plaintiff to procure an advance

of $5,000 from the bank upon the contract, to pay the defendants the sum due them and to take his own pay out of the balance. Plaintiff knew of defendants' guaranty but not of the assignment of the contract to them. · The bank refused to make the advance unless the completion and delivery of the safe was guaranteed. Defendants, who knew of the agreement with plaintiff, executed the guaranty upon receiving a draft to their order upon the bank, drawn by H., they giving to plaintiff an agreement to pay him or order the said sum of $1,125, at the time they received $5,000 for the draft ; this was accepted by the bank payable when the safe was delivered and accepted. H. also executed to defendants a chattel mortgage on the safe for the $5,000 which was duly filed. When the safe was completed and ready for delivery it was levied upon on executions against H., and while in the possession of the sheriff, notice was given by the bank that unless it was delivered in four days they would refuse to receive it and would hold defendants responsible for the damages. Le B. purchased the judgment, took the safe into his custody and refused to deliver it to the bank unless the acceptance should be indorsed over to him, his loan, the amount of the judgments and the expenses to be retained out of its proceeds. Whereupon defendants indorsed and delivered the draft to Le B., who delivered the safe and paid over to defendants a balance of $975.60. In an action upon the agreement executed by defendants to plaintiff, *held*, that plaintiff was not entitled to recover ; that defendants were only bound to pay in case they actually received the amount of the draft, and as they yielded it up to a lawful claim and from necessity, receiving therefrom a sum insufficient to pay their own claim, plaintiff's rights were gone ; that defendants did not owe the duty to plaintiff to attempt to take the safe from Le B. and to deprive him of his claim.

(Argued September 24, 1880 ; decided November 9, 1880.)

.  A<small>PPEAL</small> from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of defendants entered upon a verdict.

This action was brought upon the contract, which, with the material facts, is set forth in the opinion.    . ,

*Abram Wakeman* for appellant. Assuming that payment to the plaintiff was conditioned upon an actual personal receipt of the $5,000, the transfer of the draft by defendants, before delivery of the safe, was a violation of the contract and rendered them liable. (*Burtis* v. *Thompson*, 42 N. Y. 246 ; *Hawly* v. *Keeler*, 53 id. 114, 121 ; *Gallaher* v. *Nichols*, 60 id.

438, 448; *Cook* v. *Fiske*, 12 Grey [Mass.] 491, 493 ; Chitty on Contracts [11 Am. ed. vol.] 2, p. 1079 ; *Ichbald* v. *Western Coffee Co.*, 17 C. B. R. [N. S.] 741.) The supposed disability of defendants having arisen from their own default, cannot be interposed as an excuse for their non-performance. (Broom's Legal Maxims, 256 ; Coke on Litt. 206 *a* & 206 *b; Touting* v. *Hubbard*, 3 Bos. & Pul. 302 ; *Expositor* v. *Bowden*, 4 Ellis & B. 963, 978; *McIntire* v. *Belcher*, 14 Com. B. R. [N. S.] 654 –664.)

*Jno. E. Parsons* for respondents. The legal title to the safe was in Hendrickson, the judgment debtor, and notwithstanding the defendants' mortgage, the sheriff could take and hold possession. (*Livor* v. *Orsor*, 5 Duer, 501 ; *Hull* v. *Carnley*, 11 N. Y. 501 ; *Goulet* v. *Asseler*, 22 id. 225 ; *Manning* v. *Monaghan*, 28 id. 585 ; *Hall* v. *Sampson*, 35 id. 274 ; *Hathaway* v. *Brayman*, 42 id. 322 ; *Hammil* v. *Gillespie*, 48 id. 556.) The judge properly charged the jury that the assignment from Hendrickson, etc., gave Le Baron a right to the money received from the bank to the extent of the indebtedness to him. (*Field* v. *The Mayor, etc.*, 2 Seld. 179 ; *Stover* v. *Eycleshimer*, 3 Keyes, 620 ; *Sears* v. *Conover*, 34 Barb. 330 ; *Hall* v. *Buffalo*, 2 Abb. Ct. of App. 301.)

FINCH, J. The facts in this case are somewhat complicated, and the question involved not free from difficulty. On the 23d of July, 1870, E. M. Hendrickson entered into a contract with the Chatham National Bank, to build for that institution, and deliver at its place of business in New York City, a safe for the price of $7,000. No time for its completion and delivery was fixed by the terms of the agreement. On the same day Hendrickson borrowed of C. B. Le Baron, the sum of $1,000 and gave to the latter, as security therefor, a bond and mortgage on certain property in Brooklyn, and a bill of sale of the safe, described as being then in process of construction. As matter of fact the work of its manufacture had not at that time been commenced. On the 9th of August, and after work

was begun, Hendrickson borrowed of Le Baron the further
sum of $1,500, and then gave him as security for both loans
the bond and mortgage on property in Brooklyn; a power of
attorney to collect the price of the safe from the bank; an
assignment of the contract for construction, and the defendants'
guaranty that it should be completed and delivered by the 1st
of the next November, or in default of such delivery by that
time, the defendants should pay Le Baron the $2,500, due him
from Hendrickson. In the following December the safe was
sent to the defendants who were to do a specific part of the
work of construction, and who did so, expending upon it labor
and material to the value of about $1,500. It may be useful
at this point to determine what Le Baron's rights were as
against the defendants and Hendrickson. We may dismiss
the bill of sale as such from consideration, since at that time
the safe was not in existence, and had not even been commenced ;
and at no time was there any delivery under it by the maker.
The contract, therefore, was purely executory, and vested no
title in Le Baron. (*Andrew* v. *Newcomb,* 32 N. Y. 421;
*Comfort* v. *Kiersted,* 26 Barb. 472; *Andrews* v. *Durant,* 11
N. Y. 35.) For the same reason it could not operate as a
mortgage. (*Milliman* v. *Neher,* 20 Barb. 37.) But the
assignment of the contract and the power of attorney to col-
lect the purchase-price, gave to Le Baron the right to that sum
as collateral security for his loan whenever such price should
become payable by the performance of the contract for con-
struction. It gave him, however, no lien upon, or right to the
possession of the safe.

Such was the situation when the rights of the plaintiff in-
tervened. On the 31st of December Hendrickson and Hart
entered into an agreement by which, in consideration of the
latter's services already rendered in procuring " a loan or ad-
vance" of $2,000, and further services to be by him rendered
in procuring an additional loan or advance of $5,000, the for-
mer agreed to pay Hart $1,125. The agreement evidently
contemplated that the further advance of $5,000 was in some
manner to be obtained by Hart from the bank on the contract

for the safe, and that when so obtained he was to pay the defendants the sum due them from Hendrickson, and take his own pay out of the balance remaining. The agreement upon its face provides for such priority of payment to the defendants, although the latter were not in form parties to it. The arrangement thus made was at first sought to be carried out by giving to Hart a draft payable to his own order for $5,000, drawn by Hendrickson upon the Chatham Bank. This act was a clear violation of Le Baron's rights, so far as Hendrickson was concerned. It does not appear, however, from the evidence, that Hart knew the fact that Le Baron was already the owner of the purchase-price represented by the draft, and that Hendrickson was seeking to transfer what he had no right to receive. Hart did, indeed, know the contents of a guaranty to which we are referred, but that only showed the existence of a debt for $2,500 due Le Baron from Hendrickson, and did not reveal the assignment created for its security. Hart then went to the bank with the draft of $5,000 to procure its acceptance. Here he met with difficulty. The bank declined, unless the completion and delivery of the safe were guarantied. This requirement sent him back to the defendants. They knew of the arrangement with him, for one of them signed the agreement creating it, as a witness. The defendants agreed to execute the guaranty, and in the early days of January the parties met to complete the papers, and effect the desired purpose. The defendants gave to the bank a guaranty that the safe should be completed and delivered by the first of February, and procured at the same time a change in the arrangement with Hart. They asked to have the draft made to their own order, instead of Hart's, saying that they would give their obligation to pay him his part. Hart assenting, a draft for $5,000 was drawn on the bank payable to defendants' order, and signed by Hendrickson, and the following agreement, upon which this action is based, was executed by the defendants, and delivered, to Hart, viz.: " for account of E. M. Hendrickson we promise to pay to J. W. Hart or order the sum of eleven hundred and twenty-five dollars, at the time when we receive the sum of five

thousand dollars for draft dated January 4th, '71, made by E. M. Hendrickson, payable to our order, and accepted by the Chatham National Bank, of the city of New York." The draft was accepted by the bank, "payable when the safe now being built by E. M. Hendrickson for this bank, as per contract, is finished, placed in position in bank, and accepted by the bank officers." At the same time, and as part of the arrangement, Hendrickson executed a chattel mortgage on the safe to the defendants, conditioned for the payment of $5,000, which was duly filed; and a further agreement was signed by Hendrickson to meet the necessity of a removal of the safe for completion from the works of defendants to those of Hendrickson, by the terms of which it was agreed that the possession of the safe should remain and continue in defendants, notwithstanding such removal.

What now was the position of the defendants relative to the purchase-price of the safe, represented by the draft for $5,000 ? Under the previous agreement of December 31st, by virtue of which Hart was to receive and distribute the $5,000, the defendants were to be first paid and Hart was to look for his pay to the balance remaining. The defendants evidently were not satisfied with that arrangement. It placed the funds in Hart's hands and left them to look to him for their safety. While it provided that they were to have a right to payment prior to Hart, they chose, if they could themselves receive the fund and become the masters of it in full, to pay Hart out of it absolutely as soon as received. They evidently reasoned that with the whole fund in their hands they could take care of themselves and pay Hart besides. For that reason, and as a measure which would increase their safety, they proposed the new arrangement, and Hart assenting, the draft was drawn to their order. They held the draft, but they held it subject to Le Baron's right, and possible demand, to be first paid out of its proceeds. That right had been already conferred by Hendrickson, and the fact of such assignment was distinctly revealed to the defendants' counsel by Hendrickson himself. The defendants, too, knew of the amount of Le Baron's loan,

for they had agreed to pay it if the safe was not delivered by November 1st, and that time was already past. Their right, therefore, to this fund was subordinate to Le Baron's. When they took the acceptance, and while they held it, they knew that to the extent of his two loans to Hendrickson he was entitled to the first proceeds upon its payment. They took it, therefore, burdened with the double claim of Le Baron and of the plaintiff; the first, an incumbrance created by Hendrickson of which they had knowledge; and the second created by their own agreement made to secure the possession of the fund and give them the advantage of its distribution, if in fact it should be paid and its proceeds be received by them.

After a brief time the safe was completed in Brooklyn and ready for delivery in New York. Then a new and final complication arose. Judgments were obtained in Kings county against Hendrickson, executions issued thereon, and during a delay in the removal of the safe occasioned by an accident, it was levied upon by the sheriff and taken into his custody. This occurred in the month of March, 1871, and on the 29th of that month notice was given by the bank to the defendants that unless the safe was delivered before seven o'clock in the morning of April 3d the bank would refuse to receive it and hold the defendants responsible for damages. Then followed a race between defendants and Le Baron to purchase the judgments in order to control the possession of the safe, in which Le Baron was successful and took the safe into his custody and control. Thus fortified, he refused to deliver it to the bank unless the acceptance should be indorsed over to him and his debt and interest, the expenses of the delivery and the amount of the judgments be retained out of its proceeds. After some unavailing negotiation the defendants surrendered to the situation, indorsed the acceptance to Le Baron and transferred it to him. Thereupon the safe was delivered; the acceptance paid; Le Baron's claims satisfied; the bond and mortgage, which in the end proved to be worthless, assigned to the defendants; and the balance of cash, amounting to

$975.60, paid over to them.. Nothing was left for Hart except a suit on his contract.

We are now prepared to consider the grounds upon which that action was successfully defended, and the rulings which led to that result.

It is claimed on the part of the defendants that the agreement to pay plaintiff was conditioned upon the actual receipt of the full $5,000, without abatement or diminution from any cause, and that no liability to plaintiff arose because they never thus actually received such full and complete amount, or enough above all claims upon it to pay both them and Hart. It is claimed on the part of the plaintiff that the condition had sole reference to the actual payment by the bank of the draft held by defendants; that when paid either to them or to their order, it constituted a receipt by them of the full sum within the meaning of the condition.

The question is thus narrowed down to one of construction, and the plain intent of the parties, consistent with the language of the instrument, should be our guide to the result. What, then, as gathered from the situation and surrounding circumstances, was that intent? What did the parties themselves understand to be the purpose and meaning of the obligation upon which this action is founded ?

Plaintiff and defendants were both creditors of Hendrickson and each was looking to the purchase-price of the safe as the source from which to obtain his pay. Hart had got the draft, for $5,000, payable to his own order, but it was burdened in his hands with the claim of defendants to be first paid out of its proceeds. When the draft was changed to the order of defendants was any greater or different risk on their part intended? They knew of the debt of Hendrickson to Le Baron; their counsel knew of the latter's claim on this fund, and they knew of their own guaranty already broken. The safe was in their possession and they had a lien upon it for their labor and material. Did they mean to be bound to pay both Le Baron and Hart ? That would have left for them only part of their debt. Did they mean to agree to pay Hart and run the risk

of Le Baron's claim? That is quite improbable. They were under no such necessity. They were not bound to pay Hart except on such terms and under such circumstances as their own safety would seem to require. What then did they mean, and what did Hart understand them to mean by the agreement in question? Plainly they intended to promise and only to promise that if they got the whole $5,000, without diminution or abatement, not technically but beneficially, with nothing taken from it for another's benefit so as to impair their own right to full payment, then they would pay Hart for the simple reason that they would have Hendrickson's money with which to pay him. They assuredly intended to protect themselves and did not mean to pay Hart if from any cause they should not beneficially receive enough to pay both him and them. What did Hart understand? While he held the draft defendants were to be paid first. Did he suppose that protection was intended to be waived? It seems to us not. Nothing was really meant to be changed except the person to receive the fund and make the distribution. He must have understood, therefore, that the condition of the receipt of the $5,000 was intended to secure to defendants the same certainty of getting their full debt before his was to be payable. Not knowing of the previous assignment to Le Baron, the only danger he saw was that of judgments against Hendrickson and a levy on the safe, and against that he sought to provide by the chattel mortgage for the full $5,000. Both parties understood and we must construe the contract to mean that if from any cause the fund represented by the draft was depleted so that not enough should be beneficially received by defendants to pay both debts then they should not be called on to pay Hart's.

As matter of fact that occurred. Indeed it was certain to occur, although Hart did not know it and defendants perhaps, hoped it would not, trusting to the mortgage or some act of Hendrickson. Le Baron in possession of the safe refused to give it up unless he was paid. He claimed to have the first lien on the proceeds of the draft. He did have such lien. By notice to the bank he could have enforced it, at least against

defendants.  It answered his purpose just as well to enforce it
by holding on to the safe.  When the defendants surrendered
to his hold on the contract price they yielded to a legal right,
which they could not have resisted and ought not to have re-
sisted.  What was the consequence ?  From their beneficial
receipt of the $5,000 was taken away the amount of Le Baron's
debt, lawfully and by right, without their fault.  That part of
the $5,000 went where it belonged, to Le Baron.  Not a dol-
lar of it went to the benefit of the defendants.  Is it said they
were thereby relieved from their guaranty ?  That was of no
consequence while Le Baron was preventing the delivery of
the safe.  But it is argued that when the bank paid the draft
to Le Baron it was paid to defendants' order, and, therefore,
was received by them.  That is sacrificing the substance of the
transaction to its form.  They ordered it to be paid to him not
for their benefit, but for his, to the extent of his debt.  To that
amount Le Baron received it, not they.  Out of the manner of
their surrender shall we frame an argument that they did not
surrender at all?  The question is not how they did it, but
whether when done it enured to their benefit, or to Le Baron's
to the extent of the latter's debt.  By their indorsement they
did order the money to be paid to him, and in the absence of all
explanation might be held to have received it for that reason.
But in face of the fact that they ordered it paid to him for his
benefit and not theirs, and really received no part of it except
less than a thousand dollars, we should be doing violence to
the truth of the transaction because of its form to call it a re-
ceipt of the full sum.  The moment, therefore, the defendants
yielded, lawfully, from a necessity not to be resisted, Hart's
rights were gone.  From that moment he was entitled to
nothing because the condition could not be fulfilled.  It mat-
ters not how much more the defendants yielded, or whether
legally or without necessity.  Plaintiff had no longer any in-
terest in the question.

It is said, however, that duty to Hart required the defend-
ants to wrest the safe from Le Baron so as to get the whole
money themselves and leave the latter unpaid.  We doubt if it

could have been done, at least, in time. But if it had been plainly possible, the defendants did not owe the duty to Hart of trying to deprive Le Baron of his debt. It was no element of their obligation that they should try to accomplish a wrong for the sake of benefiting Hart. They owed him no such duty. We should divorce law from right if we held that doctrine; for Hart's debt, to speak mildly, was at least no more sacred than Le Baron's.

The case was submitted to the jury substantially according to these views, and the exceptions taken are mainly answered by them. The first request made to the court was, that a verdict should have been directed for the plaintiff. The request was properly refused. The second was that, as defendants knew of Le Baron's rights when they made the agreement with plaintiff, they could not set up those rights as an excuse for the non-delivery of the safe. But they could certainly prove the facts. The obstruction in their way was none the less an obstruction because they knew earlier the facts on which it was founded, and we cannot see that the right to take the safe was at all affected by their knowledge of the assignment of its price. The ruling, therefore, was right.

The third exception was founded upon the refusal of the court to charge that, in order to protect the defendants from liability, the claim of Le Baron to the possession of the safe must have been superior in law to theirs. The refusal was correct. The question was immaterial. Le Baron had the possession and used it to enforce a lawful claim. Even if the possession could have been wrested from him, and if it was the defendants' duty to do so, it was a question for the jury to say whether it could have been done in time to have secured the payment of the draft. It is next said that the court erred in refusing to charge that there was no evidence that the defendants used due diligence to deliver the safe within the prescribed time. There was evidence on both sides. That question of fact was vigorously contested and properly submitted to the jury. Another exception was taken to the charge that, "if you find that the defendants had reasonable ground to suppose

that they could not get the safe to the bank within the time limited by the notice of the bank without settling with Mr. Le Baron as they did, then the defendants are entitled to a verdict." This was properly said upon the question of due diligence. It was an element in that inquiry. It turned the attention of the jury to the actual situation as affecting the duty claimed to be due from the defendants. A final exception was taken to the charge, or some part of it that, "you cannot determine the question entirely upon the question of legal right. It is a question whether Mr. Le Baron having asserted these rights, having his grip upon the property, it was reasonable for them to pay his claim in order to get the safe to the bank, no matter whether his claims were legal or illegal." The exception here taken was "to that last part." Undoubtedly the last clause of the charge was the one intended to be reached. The language of the charge must not be misinterpreted. The subject under discussion was the question still of diligence in endeavoring to deliver the safe outside of Le Baron's control. Whether that control was legal or illegal, right or wrong, did not change the fact of its existence, and it was that fact as such which stood in the way and with reference to which the defendants were required to act. In the view we have taken of the case the question of due diligence raised by the plaintiff was not at all material and its submission to the jury gave him an opportunity to which he was not strictly entitled; but if it was material no error was committed in the manner of its submission to the jury.

The judgment should be affirmed with costs.

All concur.

Judgment affirmed.